107 Cal.Rptr.2d 291 (2001)
89 Cal.App.4th 928
COVENANT CARE, INC., et al., Petitioners,
v.
The SUPERIOR COURT of Los Angeles County, Respondent;
Lourdes M. Inclan et al., Real Parties in Interest.
No. B145406.
Court of Appeal, Second District, Division One.
May 25, 2001.
Rehearing Denied June 8, 2001.
As Modified June 20, 2001.
Review Granted September 19, 2001.
*292 Even, Crandall, Wade, Lowe & Gates, Randolph M. Even and Stephanie Charles, Woodland Hills, for Petitioners Covenant Care, Inc., and Covenant Care California, Inc.
Houck & Balisok, Russell S. Balisok, Steven Wilheim, Glendale, and Patricia L. Canner, for Real Parties in Interest Lourdes M. Inclan and Juan C. Inclan.
No appearance for Respondent.
MIRIAM A. VOGEL, J.
Lourdes M. Inclan and Juan C. Inclan sued Covenant Care California, Inc. (and Covenant Care, Inc.) for damages arising from the allegedly negligent care, treatment, and death of their father, Juan A. Inclan, at a hospice facility owned and *293 operated by Covenant Care.[1] More than two years later, the Inclans sought leave to file an amended pleading in which they alleged willful misconduct, elder abuse, and other intentional torts, and in which they asked for punitive damages. Covenant Care objected, contending (among other things) that the claim for punitive damages was time barred. (Code of Civ. Proc., § 425.13 [in an action for damages arising out of the professional negligence of a health care provider, the court shall not allow an amendment that includes a claim for punitive damages if the motion for such an order is not filed within two years after the complaint is filed].)[2] The trial court rejected Covenant Care's argument and accepted the Inclans' assertion that section 425.13 does not apply to the Elder Abuse and Dependent Adult Civil Protection Act (Welf. & Inst.Code, § 15600).[3] Covenant Care then filed a petition for a writ of mandate, and we issued an order to show cause.
We decline Covenant Care's invitation to conclude that those who sue on behalf of an elderly person injured by a recklessly neglectful custodian must comply with the procedural requirements of section 425.13 simply because the custodian happens also to be a health care provider. We deny Covenant Care's petition.

DISCUSSION

A.
Section 425.13, enacted in 1987 as the Willie L. Brown, Jr.-Bill Lockyer Civil Liability Reform Act of 1987 (Stats.1987, ch. 1498, §§ 1-7, pp. 5777-5782), establishes a "pretrial hearing mechanism" designed "to protect health care providers from the onerous burden of defending against meritless punitive damage claims." (Central Pathology Service Medical Clinic, Inc. v. Superior Court (1992) 3 Cal.4th 181, 188-189, 10 Cal.Rptr.2d 208, 832 P.2d 924; College Hospital Inc. v. Superior Court (1994) 8 Cal.4th 704, 714, 34 Cal.Rptr.2d 898, 882 P.2d 894.)[4] It provides as follows:
"(a) In any action for damages arising out of the professional negligence of a health care provider, no claim for punitive damages shall be included in a complaint or other pleading unless the court enters an order allowing an amended pleading that includes a claim for punitive damages to be filed. The court may allow the filing of an amended pleading claiming punitive damages on a motion by the party seeking the amended pleading and on the basis of the supporting and opposing affidavits presented that the plaintiff has established that there is a substantial probability that the plaintiff will prevail on the claim pursuant to Section 3294 of the Civil Code. The court shall not grant a motion allowing the filing of an amended pleading that includes a claim for punitive damages if the motion for such an order is not filed within two years after the complaint or initial pleading is filed or not less than nine months before the date the matter is first set for trial, whichever is earlier.
*294 "(b) For the purposes of this section, `health care provider' means any person licensed or certified pursuant to [specified sections of the Business and Professions Code or the Health and Safety Code]. 'Health care provider' includes the legal representatives of a health care provider."

B.
Although section 425.13 on its face applies only to actions involving "negligence," the statute in fact applies whenever an injured party seeks punitive damages in an action "directly related to the professional services provided by a health care provider acting in its capacity as such...." (Central Pathology Service Medical Clinic, Inc. v. Superior Court, supra, 3 Cal.4th at pp. 191-192, 10 Cal. Rptr.2d 208, 832 P.2d 924.) The identification of a cause of action as an "intentional tort" as opposed to "negligence" does not determine the outcome; the "allegations that identify the nature and cause of a plaintiffs injury must be examined to determine whether each is directly related to the manner in which professional services were provided." (Id. at p. 192, 10 Cal. Rptr.2d 208, 832 P.2d 924.) As the Supreme Court explained, a literal interpretation of "negligence" would lead to an anomalous resultsince there are few situations in which mere negligence can support a claim for punitive damages, section 425.13 would be rendered virtually meaningless by a construction that excluded intentional torts. (3 Cal.4th at p. 191, 10 Cal.Rptr.2d 208, 832 P.2d 924.)
Based on the Central Pathology analysis, section 425.13 has been broadly applied to a variety of intentional torts. (Central Pathology Service Medical Clinic, Inc. v. Superior Court, supra, 3 Cal.4th at pp. 192-193, 10 Cal.Rptr.2d 208, 832 P.2d 924 [claims of fraud and intentional infliction of emotional distress based on a failure to alert the plaintiff to the onset of her cancer were "directly related" to the health care provider's professional services because they emanated from the manner in which the results of medical tests were communicated]; College Hospital Inc. v. Superior Court, supra, 8 Cal.4th at pp. 709-714, 34 Cal.Rptr.2d 898, 882 P.2d 894 [claim for intentional infliction of emotional distress by a patient alleging trauma when her extramarital affair with a hospital employee ended was "directly related" to the services provided by the hospital]; Davis v. Superior Court (1994) 27 Cal.App.4th 623, 630, 33 Cal.Rptr.2d 6 [claim that treating physician falsified medical findings to deprive the plaintiff of his workers' compensation benefits was "directly related" to the professional services provided by the doctor]; United Western Medical Centers v. Superior Court (1996) 42 Cal. App.4th 500, 502-505, 49 Cal.Rptr.2d 682 [claims of gross negligence, assault and battery based on a sexual assault by two hospital employees while the plaintiff was recovering from a brain stem injury were "directly related" to the professional services provided by the hospital]; Cooper v. Superior Court (1997) 56 Cal.App.4th 744, 750-751, 65 Cal.Rptr.2d 674 [allegations of sexual battery and other torts arising out of an improper sexual touching during a gynecological examination were "directly related" to the manner in which the gynecological services were rendered].)

C.
The Inclans acknowledge the rules just discussed but contend their elder abuse claim is exempt from the procedural hurdles created by section 425.13. We agree.

1.
Elder abuse is both a crime and a civil wrong. (Pen.Code, § 368; Welf. & Inst. *295 Code, § 15600 et seq.)[5] In the criminal context, elders are in need of "special protections" because they "may be confused, on various medications, mentally or physically impaired, or incompetent, and therefore less able to protect themselves, to understand or report criminal conduct, or to testify in court proceedings on their own behalf." (Pen.Code, § 368, subd. (a).) In the civil context, the Legislature has recognized that elders "may be subjected to abuse, neglect, or abandonment"; that elderly persons constitute "a significant and identifiable segment of the population"; that most elders who are at the greatest risk of abuse, neglect, or abandonment by their families or caretakers suffer physical impairments and poor health that place them in a dependent and vulnerable position; that "infirm elderly persons and dependent adults are a disadvantaged class, that cases of abuse of these persons are seldom prosecuted as criminal matters, and few civil cases are brought in connection with this abuse due to problems of proof, court delays, and the lack of incentives to prosecute these suits"; and that it is therefore the intent of the Legislature in enacting the Elder Abuse Act "to enable interested persons to engage attorneys to take up the cause of abused elderly persons and dependent adults." (§ 15600, italics added; see also Delaney v. Baker (1999) 20 Cal.4th 23, 42, 82 Cal.Rptr.2d 610, 971 P.2d 986 [through the application of "heightened civil remedies," these statutes protect elders "from being recklessly neglected at the hands of their custodians, which includes the nursing homes or other health care facilities in which they reside"].)[6]
To these ends, a plaintiff who proves "by clear and convincing evidence" that a defendant is liable for physical abuse, neglect, or fiduciary abuse, and that the defendant has been guilty of "recklessness, oppression, fraud, or malice" in the commission of this abuse, may recover both attorneys' fees and costs. (§ 15657, subd. (a)). On the same conditions, a plaintiff who brings suit as the personal representative of a deceased elder is relieved of the limitation imposed by Code of Civil Procedure section 377.34, and may recover damages for the emotional distress suffered by the decedent prior to his death (but the emotional distress damages cannot exceed the $250,000 cap imposed by Civil Code section 3333.2). (§ 15657, subd. (b); but see Perry v. Shaw, supra, 88 Cal.App.4th 658, 106 Cal.Rptr.2d 70.)[7]

*296 2.
In Delaney v. Baker, supra, 20 Cal.4th 23, 82 Cal.Rptr.2d 610, 971 P.2d 986, the question before the Supreme Court was whether a health care provider charged with the "reckless neglect" of a deceased elder within the meaning of section 15657 could be liable for attorneys' fees and emotional distress damages. The question arose because of an apparent inconsistency between section 15657 and a related section in the Elder Abuse Act, section 15657.2, which provides: "Notwithstanding this article, any cause of action for injury or damage against a health care provider, as defined in [s]ection 340.5 of the Code of Civil Procedure [the MICRA statute of limitations governing actions against health care providers], based on the health care provider's alleged professional negligence, shall be governed by those laws which specifically apply to those professional negligence causes of action." (Italics added.) According to the defendant in Delaney, the reference in section 15657.2 to a claim "based on ... professional negligence" covers all conduct directly related to the rendition of professional services (not just negligence)and exempts health care providers from the heightened remedies of section 15657, notwithstanding a finding that the health care provider has recklessly neglected an elder. (Delaney v. Baker, supra, 20 Cal.4th at pp. 30-31, 82 Cal.Rptr.2d 610, 971 P.2d 986.)
The Supreme Court rejected the health care provider's broad reading of section 15657.2 and analyzed the problem this way: "The starting point of our analysis is the language of the statutes themselves. 'Professional negligence' in section 15657.2 is defined elsewhere as a `negligent act or omission to act by a health care provider in the rendering of professional services.' (Code Civ. Proc., § 340.5.) Generally `negligence' is the failure "`to exercise the care a person of ordinary prudence would exercise under the circumstances.'" [Citation.] 'Professional negligence' is one type of negligence, to which general negligence principles apply....
"In order to obtain the remedies available in section 15657, a plaintiff must demonstrate by clear and convincing evidence that defendant is guilty of something more than negligence; he or she must show reckless, oppressive, fraudulent, or malicious conduct. The latter three categories involve `intentional,' `willful,' or `conscious' wrongdoing of a `despicable' or `injurious' nature. [Citations.] `Recklessness' refers to a subjective state of culpability greater than simple negligence, which has been described as a `deliberate disregard' of the 'high degree of probability' that an injury will occur [citations]. Recklessness, unlike negligence, involves more than `inadvertence, incompetence, unskillfulness, or a failure to take precautions' but rather rises to the level of a `conscious choice of a course of action ... with knowledge of the serious danger to others involved in it.' [Citation; fn. omitted.]
"Section 15657.2 can therefore be read as making clear that the acts proscribed by section 15657 do not include acts of simple professional negligence, but refer to forms of abuse or neglect performed with some state of culpability greater than mere negligence. Thus, amici curiae argue, causes of actions within the scope of section 15657 are not `cause[s] of action ... based on ... professional negligence' within the meaning of section 15657.2. Defendants claim that such an interpretation would render section 15657.2 surplusage because section 15657 already on its face *297 excludes actions based on professional negligence strictly construed. We disagree. The Legislature could have reasonably decided that an express statement excluding professional negligence from section 15657 was needed because the language of section 15657, and in particular the terms 'neglect' and `recklessness,' may have been too indefinite to make sufficiently clear that `professional negligence' was to be beyond the scope of section 15657.
"Amici curiae's interpretation is supported by the legislative history of section 15657. The sponsor of the legislation, the Beverly Hills Bar Association, was quoted in a Senate committee analysis appearing shortly before the bill's enactment as `argu[ing] strenuously that the high standard imposed by the billclear and convincing evidence of (i) liability and (ii) recklessness, malice, oppression or fraud adequately protects providers of care from acts of simple negligence, or even gross negligence. [Senate Bill No.] 679 only pertains to acts of egregious abuse. The sponsor argues that existing limitations on damages and fees should not apply in such extreme cases.' [Citation.]
"If, on the other hand, the Legislature meant in section 15657.2 to exempt health care professionals in large part from section 15657 liability, why would it use the term `professional negligence' in the former section when, as discussed above, negligence is commonly regarded as distinct from the reckless, malicious, oppressive or fraudulent conduct with which section 15657 is concerned? We do not believe the Legislature `would ... have chosen such an obscure mechanism to achieve its purpose.' [Citation.]
"Amici curiae's position is also supported by a consideration of the differing purposes of MICRA and the Elder Abuse Act. The purpose of the latter is essentially to protect a particularly vulnerable portion, of the population from gross mistreatment in the form of abuse and custodial neglect.... `In 1982, the Legislature recognized "that dependent adults may be subjected to abuse, neglect, or abandonment and that this state has a responsibility to protect such persons." [Citation.]' It adopted measures designed to encourage the reporting of such abuse and neglect. [Citation.] Subsequent amendment refined the 1982 enactment, but the focus remained on reporting abuse and using law enforcement to combat it [citation]. Also, Penal Code section 368 was enacted, making it a felony or misdemeanor (depending on the circumstances), for, among other things, a custodian of an elder or dependent adult to willfully cause or permit various types of injury. [Citation.]
"In the 1991 amendments at issue here, the focus shifted to private, civil enforcement of laws against elder abuse and neglect. '[T]he Legislature declared that "infirm elderly persons and dependent adults are a disadvantaged class, that cases of abuse of these persons are seldom prosecuted as criminal matters, and few civil cases are brought in connection with this abuse due to problems of proof, court delays, and the lack of incentives to prosecute these suits." [Citation.] It stated the legislative intent to "enable interested persons to engage attorneys to take up the cause of abused elderly persons and dependent adults." [Citations.] As was stated in the Senate Rules Committee's analysis of Senate Bill No. 679, `in practice, the death of the victim and the difficulty in finding an attorney to handle an abuse case where attorneys fees may not be awarded, impedes many victims from suing successfully. [] This bill would address the problem by: ... authorizing the court to award attorney's fees in specified cases; [and by] allowing pain and suffering damages to be awarded when a verdict of *298 intentional and reckless abuse was handed down after the abused elder dies.' [Citation.]
"MICRA has a different focus. The impetus for MICRA was the rapidly rising costs of medical malpractice insurance in the 1970's. `The inability of doctors to obtain such insurance and reasonable rates is endangering the health of the people of this State, and threatens the closing of many hospitals.' [Citations.] The response was to pass the various statutes that comprise MICRA to limit damages for lawsuits against a health care provider based on professional negligence. [Citations.] [¶] [The focus of the Elder Abuse Act is] `neglect,' `physical abuse' and `fiduciary abuse' [with the emphasis on] the failure of those responsible for attending to the basic needs and comforts of elderly or dependent adults, regardless of their professional standing, to carry out their custodial obligations....
"The difficulty in distinguishing between `neglect' and `professional negligence' lies in the fact that some health care institutions, such as nursing homes, perform custodial functions and provide professional medical care. When, for example, a nursing home allows a patient to suffer malnutrition, defendants appear to argue that this was `professional negligence,' the inability of nursing staff to prescribe or execute a plan of furnishing sufficient nutrition to someone too infirm to attend to that need herself. But such omission is also unquestionably `neglect' [within the meaning of the Elder Abuse Act].
"Section 15657 provides the way out of this ambiguity: if the neglect is `reckless[ ],' or done with `oppression, fraud or malice,' then the action falls within the scope of section 15657 and as such cannot be considered simply `based on ... professional negligence' within the meaning of section 15657.2. The use of such language in section 15657, and the explicit exclusion of `professional negligence' in section 15657.2, make clear the Elder Abuse Act's goal was to provide heightened remedies for, as stated in the legislative history, 'acts of egregious abuse' against elder and dependent adults [citation], while allowing acts of negligence in the rendition of medical services to elder and dependent adults to be governed by laws specifically applicable to such negligence. That only these egregious acts were intended to be sanctioned under section 15657 is further underscored by the fact that the statute requires liability to be proved by a heightened 'clear and convincing evidence' standard.
"Defendants contend ... that the term `based on ... professional negligence,' used in section 15657.2, applies to any actions directly related to the professional services provided by a health care provider. The adoption of such a position would produce an anomalous result. It would make the determination as to whether the 'recklessly neglectful' custodians of an elderly person were subject to section 15657 turn on the custodian's licensing status: A custodian who allowed an elder or dependent adult in his or her care to ... become malnourished would be subject to 15657's heightened remedies only if he or she was not a licensed health care professional, [¶] There is no indication that the Legislature intended this anomaly.... [¶] ... [T]he legislative history demonstrates that one of the main purposes of section 15657 was the elimination of the institutional abuse of the elderly in health care facilities ....
"The legislative history also discloses the assumption of opponents of Senate Bill No. 679 that the heightened remedies of section 15657 were to apply to health care providers.... [The California Association of Health Facilities] withdrew its opposition only after a number of amendments it *299 proposed designed to limit exposure of health facilities to damages, such as the imposition of a damage cap on pain and suffering damages [citation] and the placement of limitations on employer liability [citation], were included in the final legislation. [Citation; fn. omitted.] [¶] From this legislative history, it appears clear that both the Legislature that enacted Senate Bill No. 679 and the opponents of Senate Bill No. 679 understood that one of the major objectives of this legislation was the protection of residents of nursing homes and other health care facilities. It is contrary to this objective to then read the phrase `based on . . . professional negligence' found in section 15657.2 to mean that nursing homes or other health facilities are largely exempt from liability under section 15657 for the heightened remedies to which custodians who are not health care professionals are subject.
"Defendants[] ... contend that the term `based on ... professional negligence' means the same as `arising out of professional negligence,' as the term was interpreted in Central Pathology, and that the court interpreted the latter phrase to mean any act `directly related to defendants' performance of professional services.' [Citation.] But . .. defendants have given Central Pathology a broader reading than was intended. [¶] ... The Central Pathology court considered whether section 425.13(a) applied in a case against health care providers that alleged both medical negligence and intentional torts (intentional infliction of emotional distress and fraud) in connection with a failure to timely alert plaintiff to the onset of her cancer. [¶] ...
"The legislative history revealed that section 425.13, as originally passed in 1987, had simply applied to all claims against health care providers. [Citation.] When that section was amended in 1988, . .. the comment of the Assembly Subcommittee on the Administration of Justice stated: `"This bill is intended to correct an oversight. As written, Section 4215.13 [sic] could apply to any lawsuit against any health care provider.... Arguably, this could include lawsuits unrelated to the practitioner's practice, such as defamation, fraud, and intentional torts. [¶] The author [of the original version of section 425.13] asserts that the intention ... was to provide protection to health practitioners in their capacity as practitioners. Specifically, relief was sought from unsubstantiated claims of punitive damages in actions alleging professional negligence. There was no intent to protect practitioners in any other capacity. [The amendment] limits the application of Section [425.13(a)] to lawsuits involving allegations of a health practitioner's `professional negligence.'"' [Citation.]
"The Central Pathology court then concluded[,] `The Assembly subcommittee's comment emphasizes that lawsuits unrelated to a practitioner's conduct in providing health care related services were intended to be excluded from the ambit of section 425.13. Plaintiffs contend that the inclusion of the term "intentional torts" in the list of lawsuits assumed to be unrelated to the practitioner's practice demonstrates that the Legislature intended to exclude all intentional torts from the requirements of section 425.13. From our review of the history of the statute, however, we conclude that the reference to "intentional torts" by the author of the comments does not belie its statement of the essential purpose of the amendmentto restrict the application of section 425.13 to lawsuits brought against health practitioners "in their capacity as practitioners."' [Citation.]
"The Central Pathology court's reasoning was based on an examination not only *300 of the particular legislative history of section 425.13(a), but also of the statute's purposes. As the court stated, `Under [a contrary] reading of section 425.13(a), injured patients seeking punitive damages in an action involving professional negligence could readily assert that their health care providers committed an intentional tort and that the patients seek punitive damages only in connection with the intentional tort. By including a cause of action for an intentional tort in a negligence action, plaintiffs would sidestep section 425.13(a) and the resulting procedural requirements the Legislature sought to impose on them. Thus, [such an interpretation] of section 425.13(a) effectively permits artful pleading to annul the protection afforded by that section.' [Citation.]
"Moreover, the court reasoned that a contrary reading would lead to an absurd result. `If we were to accept the [contrary] interpretation of [section] 425.13(a), the section's protections would apply only to "nonintentional tort" conduct that gives rise to punitive damages. There are, however, few situations in which claims for punitive damages are predicated on mere negligence or a conscious disregard of the rights or safety of others and in which no intentional torts are alleged. [Citation.] An interpretation of the statute that would restrict its applicability to such a limited category of cases is inconsistent with the intention of the Legislature to protect health care providers from frequently pleaded and frivolous punitive damage claims.... [S]uch an interpretation would render the statute virtually meaningless.' [Citation.]
"Therefore, in considering the scope of section 425.13(a), the court [recognized] `that in the medical malpractice context, there may be considerable overlap of intentional and negligent causes of action [and did not limit] application of MICRA provisions to causes of action that are based solely on a "negligent act or omission" as provided in th[o]se statutes. To ensure that the legislative intent underlying MICRA is implemented, [the Supreme Court] recognized that the scope of conduct afforded protection under MICRA provisions (actions "based on professional negligence") must be determined after consideration of the purpose underlying each of the individual statutes.' [Citation.] The court concluded . .. that given the purpose underlying section 425.13(a), the phrase `arising out of professional negligence' should be interpreted to pertain to causes of action `directly related to the manner in which professional services were provided' regardless of whether these claims could be characterized as negligent or intentional torts. [Citation.] [¶].... [¶]...
"In the present case we find that the Elder Abuse Act presents a very different statutory scheme from section 425.13(a).... Interpreting the phrase 'based on professional negligence' narrowly would not render section 15657 meaningless, as was the case with section 425.13(a). Rather, such an interpretation would enhance the former statute's remedial purpose, protecting elder and dependent adults who are residents of nursing homes and other health care facilities from reckless neglect and various forms of abuse. Indeed, ... this interpretation would avoid the anomaly of having health care professionals exempted from section 15657's heightened remedies for the very same misconduct for which nonprofessionals would be liable.
"Moreover, there is no comparable legislative history in the Elder Abuse Act that would suggest an expansive reading of the phrase `based on professional negligence.' There is no suggestion in th[e] history that the Legislature meant by `based on profesional *301 negligence' to refer to any action `against health practitioners "in their capacity as practitioners."` On the contrary, as discussed, the legislative history suggests that nursing homes and other health care providers were among the primary targets of the Elder Abuse Act.
"The other reason supporting Central Pathology's holdingpreventing the frustration of the statute's purpose through artful pleadingis also not applicable to section 15657. Regardless of what plaintiffs plead, they would not be entitled to the heightened remedies of section 15657 unless they proved statutory abuse or neglect committed with recklessness, oppression, fraud or malice. Of course, the existence of such a remedy may increase the settlement value of the claim, but only to the extent that the facts indicate that defendant had committed reckless neglect, etc. Such increase in settlement value bolsters, rather than frustrates, the purpose of section 15657. [¶] ...
"We emphasize that our interpretation of the phrase `based on professional negligence' found in the unique statutory scheme of the Elder Abuse Act is not necessarily applicable to other statutes in which that phrase appears. Consistent with the Central Pathology court, we stress that the meaning of the phrase would depend upon the legislative history and underlying purpose of each of the statutes. [Citation.] Specifically, we do not purport to construe the meaning of the same phrase within the context of the MICRA statutes. It is, of course, `generally presumed that when a word is used in a particular sense in one part of a statute, it is intended to have the same meaning if it appears in another part of the same statute.' [Citation.] But that presumption is rebuttable if there are contrary indications of legislative intent. And the presumption does not apply when the same or a similar phrase appears in different statutory schemes with distinct designs and objectives. [Fn. omitted.] Establishing terminological uniformity throughout our codified law is less important than discerning "`the intent of the Legislature so as to effectuate the purpose'" of each individual statute. [Citation.] A narrow reading of the phrase `based on professional negligence' in this context is consistent with one of the primary purposes of section 15657 to protect elder adults through the application of heightened civil remedies from being recklessly neglected at the hands of their custodians, which includes the nursing homes or other health care facilities in which they reside." (Delaney v. Baker, supra, 20 Cal.4th at pp. 31-42, 82 Cal. Rptr.2d 610, 971 P.2d 986, most emphasis added.)

3.
In Central Pathology, the Supreme Court held (in 1992) that "arising out of professional negligence" as used in section 425.13, subdivision (a), includes intentional torts, not just negligence. (Central Pathology Service Medical Clinic, Inc. v. Superior Court, supra, 3 Cal.4th at p. 191, 10 Cal.Rptr.2d 208, 832 P.2d 924.) In Delaney v. Baker, supra, 20 Cal.4th at page 40, 82 Cal.Rptr.2d 610, 971 P.2d 986, the Supreme Court held (in 1999) that the Elder Abuse Act "presents a very different statutory scheme from section 425.13(a) discussed in Center Pathology." But the Supreme Court did not in either case have before it the question now before us whether those heightened remedies adopted to encourage civil enforcement of the elder abuse laws include the right to plead punitive damages free from the procedural hurdles imposed by section 425.13. Covenant Care says the question has been answered, and accurately, by Division Two of the Fourth District in Community Care & Rehabilitation Center v. Superior Court *302 (2000) 79 Cal.App.4th 787, 94 Cal.Rptr.2d 343. The trial court disagreed, finding that Community Care is inconsistent with Delaney. We agree with the trial court.
In Community Care, a surviving spouse and children (the DeGroods) sued for wrongful death damages, alleging that the Community Care and Rehabilitation Center (CCRC) was negligent, that it was guilty of criminal elder abuse in violation of Penal Code section 368, and that it was liable on a variety of intentional tort theories. The original complaint sought punitive damages, which CCRC moved to strike on the ground that the DeGroods had failed to comply with section 425.13. The trial court agreed with the DeGroods that section 425.13 did not apply, but the Court of Appeal granted CCRC's petition for a writ of mandate. We believe Community Care reached the wrong result.
First, it is based in part on a wholly unsupported assertion that section 425.13 "is clearly conceptually related to the statutes enacted as part of [MICRA]." (Community Care & Rehabilitation Center v. Superior Court, supra, 79 Cal.App.4th at p. 791, fn. 6, 94 Cal.Rptr.2d 343.) We do not agree. MICRA was adopted in 1975 to address a medical malpractice crisis by controlling the costs of malpractice insurance. (Western Steamship Lines, Inc. v. San Pedro Peninsula Hospital (1994) 8 Cal.4th 100, 112, 32 Cal.Rptr.2d 263, 876 P.2d 1062.) Section 425.13 was adopted in 1987 to "require greater certainty of the propriety of imposing punitive damages by requiring clear and convincing evidence of fraud, malice, or oppression," and to make it more difficult to assert an unsubstantiated claim for punitive damages against a health care provider. (Central Pathology Service Medical Clinic, Inc. v. Superior Court, supra, 3 Cal.4th at p. 189, 10 Cal. Rptr.2d 208, 832 P.2d 924.) Since malpractice insurance does not cover punitive damages (Ins.Code, § 533; Peterson v. Superior Court (1982) 31 Cal.3d 147, 157, fn. 4, 181 Cal.Rptr. 784, 642 P.2d 1305.; City Products Corp. v. Globe Indemnity Co. (1979) 88 Cal.App.3d 31, 151 Cal.Rptr. 494) the only common thread is that both statutes protect health care providers.
Second, Community Care paints with too broad a brush. It appears that the DeGroods alleged no more than medical malpractice, and that their ability to allege a claim of elder abuse arose from the wholly serendipitous fact that the decedent happened to die at the nursing home to which she was transferred following surgery. As described by the Court of Appeal, the DeGroods' elder abuse allegations were that CCRC failed to "timely assess decedent's medical condition and develop a care plan"; failed to "carefully and properly examine, diagnose, evaluate, test, and properly react to, emergent conditions, including a severe infection"; failed to properly "prescribe, administer, [and] regulate ... medications"; failed to "properly ... treat decedent"; and failed to provide "appropriate, prudent, and timely medical care and treatment for decedent." By describing these allegations as "elder abuse," the DeGroods gave meaning to the Central Pathology court's concerns about artful pleading as a ruse to annul the protection afforded by section 425.13. In an action involving professional negligence and nothing more, the DeGroods asserted that CCRC was guilty of elder abuse for the apparent purpose of sidestepping the procedural requirements of section 425.13, subdivision (a). (Central Pathology Service Medical Clinic, Inc. v. Superior Court, supra, 3 Cal.4th at p. 191, 10 Cal.Rptr.2d 208, 832 P.2d 924.) At least insofar as we can tell from the court's opinion, it does not appear that the DeGroods had legitimate claims of elder abuse. (Community Care & Rehabilitation *303 Center v. Superior Court, supra, 79 Cal.App.4th at p. 792, 94 Cal.Rptr.2d 343 ["[h]owever it may be framed, in sum and substance the DeGroods assert that CCRC was remiss in providing health care services"].) Where the emphasis of an action is on elder abuse and the abuser is primarily a custodian and only incidentally a health care provider, the action is not one that arises out of professional negligence within the meaning of section 425.13.
Third, Community Care "stress[ed] that ... section 425.13 does not prohibit the recovery of punitive damages against a health care provider. It only establishes procedures designed to ensure that a claim for such damages is not made without foundation. Thus, applying ... section 425.13 does not mean that the Elderly Abuse Act plaintiff will lose a valuable right; it merely means that punitive damages cannot be demanded in bad faith or as a tactical ploy designed to coerce a hasty settlement." (Community Care & Rehabilitation Center v. Superior Court, supra, 79 Cal.App.4th at p. 796, 94 Cal. Rptr.2d 343.) Not so. Where, as here, the motion for leave to add a claim for punitive damages is made more than two years after the complaint is filed, the motion must be denied. (§ 425.13, subd. (a).) It does not follow, as Community Care suggests, that the application of section 435.13 to an elder abuse claim will "not mean [the plaintiffs] cannot, or will not, recover punitive damages...." (Community Care & Rehabilitation Center v. Superior Court, supra, 79 Cal.App.4th at p. 797, 94 Cal.Rptr.2d 343.)
Fourth, Community Care expresses a concern about artful pleading, and suggests it would be "anomalous for health care providers to be subjected to possibly meritless, strategic demands for punitive damages in cases brought by persons described in the Elder Abuse Act, simply by 'artfully pleading' the claim in terms of elder or dependent adult abuse or neglect rather than medical malpractice. Rather, the requirements of ... section 425.13 should be followed whenever the gravamen of an action is professional malfeasance that is, malfeasance in the provision of health care services." (Community Care & Rehabilitation Center v. Superior Court, supra, 79 Cal.App.4th at p. 797, 94 Cal.Rptr.2d 343.) We do not agreenotwithstanding that the Supreme Court admittedly sees a difference between (i) pleading an intentional tort in an ordinary medical malpractice case in order to justify a prayer for punitive damages, and (ii) pleading elder abuse in a wrongful death action arising out of medical malpractice in order to justify a prayer for attorneys' fees and emotional distress damages. (Central Pathology Service Medical Clinic, Inc. v. Superior Court, supra, 3 Cal.4th at p. 191, 10 Cal.Rptr.2d 208, 832 P.2d 924; Delaney v. Baker, supra, 20 Cal.4th at p. 41, 82 Cal.Rptr.2d 610, 971 P.2d 986.) In our view, the distinction is one without a meaningful difference. In both situations, an artful pleader will include the allegations necessary to enhance the settlement value of the case. In both situations, conclusory allegations can be disposed of by standard motions to strike (Code Civ. Proc, §§ 435, subd. (b), 436, subd. (a); Garcia v. Sterling (1985) 176 Cal.App.3d 17, 20, 221 Cal.Rptr. 349) or for summary judgment (Code Civ. Proc., § 437c, subd. (a); Chern v. Bank of America (1976) 15 Cal.3d 866, 873, 127 Cal.Rptr. 110, 544 P.2d 1310). We do not think the apparent conflict between Central Pathology and the Elder Abuse Act ought to be resolved on this point.[8]
*304 Fifth, we disagree with Community Care's suggestion that a construction exempting elder abuse cases from the requirements of section 425.13 "would have constitutional implications" because (in the Community Care court's view) "[n]o reason is readily apparent why such persons should receive more favorable treatment with respect to punitive damages than other injured persons bringing suit against health care providers. There is no reason to suppose that the elderly and dependent (or their representatives) are less likely to bring unsubstantiated claims for punitive damages than other plaintiffs." (Community Care & Rehabilitation Center v. Superior Court, supra, 79 Cal.App.4th at p. 797, 94 Cal.Rptr.2d 343.) The Legislature found to the contrary. As explained in section 15600, "infirm elderly persons ... are a disadvantaged class, ... and few civil cases are brought in connection with this abuse due to problems of proof, court delays, and the lack of incentives to prosecute these suits...." As section 15600 also makes clear, it was "the intent of the Legislature in [enacting the Elder Abuse Act] ... [¶] ... to enable interested persons to engage attorneys to take up the cause of abused elderly persons and dependent adults." (§ 15600, subds.(h), (j), italics added; see also Delaney v. Baker, supra, 20 Cal.4th at p. 42, 82 Cal.Rptr.2d 610, 971 P.2d 986.) We see no constitutional issues.
For these reasons, we will not follow Community Care.

D.
The better question, we think, is whether there is in fact a conflict between the Central Pathology court's interpretation of section 425.13 on the one hand (Central Pathology Service Medical Clinic, Inc. v. Superior Court, supra, 3 Cal.4th at pp. 191-192, 10 Cal.Rptr.2d 208, 832 P.2d 924) and, on the other, the Legislature's intent to provide enhanced civil remedies and other "incentives" to those willing to prosecute elder abuse actions (§ 15600; Delaney v. Baker, supra, 20 Cal.4th 23, 82 Cal.Rptr.2d 610, 971 P.2d 986). We view the conflict as more imagined than real.
The Delaney court held that a cause of action alleging reckless, oppressive, fraudulent or malicious elder abuse is not a cause of action "based on ... professional negligence" within the meaning of section 15657.2. (Delaney v. Baker, supra, 20 Cal.4th at p. 32, 82 Cal.Rptr.2d 610, 971 P.2d 986.) But it does not follow that, because it alleges something more than negligence, such a cause of action is necessarily one alleging an intentional tort within the meaning of Central Pathology (Delaney v. Baker, supra, 20 Cal.4th at p. 37, 82 Cal.Rptr.2d 610, 971 P.2d 986 [Central Pathology should not be given "a broader reading than was intended"]), or that it is one necessarily arising out of a health care provider's failure to provide (or negligent provision of) medical services. (Cf. Community Care & Rehabilitation Center v. Superior Court, supra, 79 Cal.App.4th at p. 792, 94 Cal.Rptr.2d 343.) Instead, it is a cause of action arising out of a unique statutory scheme enacted to protect elderly persons from reckless neglect at the hands of their custodians. That their custodians may sometimes be the nursing homes or health care facilities where they reside is purely incidental. (See Delaney *305 v. Baker, supra, 20 Cal.4th at p. 42, 82 Cal.Rptr.2d 610, 971 P.2d 986.)
Given the Legislature's express findings that infirm elderly persons and dependent adults belong to a disadvantaged class, that "few civil cases are brought in connection with this abuse" due in part to "the lack of incentives to prosecute these suits," and given the Legislature's declaration of its intent "to enable interested persons to engage attorneys to take up the cause of abused elderly persons and dependent adults" (§ 15600, subds.(h), (j)), we are satisfied that the result we reach is consistent with the Legislature's intent. (Delaney v. Baker, supra, 20 Cal.4th at p. 31, 82 Cal.Rptr.2d 610, 971 P.2d 986.) This is, after all, only a matter of pleadingand there is nothing in this opinion that would make it easier for a plaintiff to prove an entitlement to punitive damages based on elder abuse.

DISPOSITION
The petition is denied. The Inclans are entitled to their costs of these writ proceedings.
ORTEGA, Acting P.J., and MALLANO, J., concur.
NOTES
[1] The Inclans also sued Grancare, Inc., and related entities and individuals, but a stay order issued in the parent company's bankruptcy precludes their involvement in these writ proceedings. (Shah v. Glendale Federal Bank (1996) 44 Cal.App.4th 1371, 1374-1379, 52 Cal.Rptr.2d 417; Cathey v. Johns-Manville Sales Corp. (6th Cir.1983) 711 F.2d 60, 61.)
[2] All references to section 425.13 are to that section of the Code of Civil Procedure.
[3] Undesignated section references (except section 425.13) are to the Welfare and Institutions Code.
[4] Section 425.13 is not part of the Medical Injury Compensation Reform Act (MICRA). (Central Pathology Service Medical Clinic, Inc. v. Superior Court, supra, 3 Cal.4th at p. 187, 10 Cal.Rptr.2d 208, 832 P.2d 924; see also Perry v. Shaw (2001) 88 Cal.App.4th 658, 666-667, 106 Cal.Rptr.2d 70.)
[5] Most of the statutes addressing elder abuse also address dependent adult abuse. (E.g., Pen.Code, § 368; Welf. & Inst. Code, § 15600.) Since the case now before us involves elder abuse, our discussion is limited to that subject.
[6] Elder abuse can arise a number of ways physical abuse, neglect, abandonment, isolation, financial abuse, deprivation by a care custodian of necessary goods or services, or other treatment that results in physical harm, pain, or mental suffering. (§§ 15610.07, 15610.30, 15610.43, 15610.57, 15610.63.)
[7] In its entirely, section 15657 provides: "Where it is proven by clear and convincing evidence that a defendant is liable for physical abuse as defined in Section 15610.63, neglect as defined in Section 15610.57, or fiduciary abuse as defined in Section 15610.30, and that the defendant has been guilty of recklessness, oppression, fraud, or malice in the commission of this abuse, in addition to all other remedies otherwise provided by law: [¶] (a) The court shall award to the plaintiff reasonable attorney's fees and costs. The term 'costs' includes, but is not limited to, reasonable fees for the services of a conservator, if any, devoted to the litigation of a claim brought under this article, [¶] (b) The limitations imposed by Section [377.34] of the Code of Civil Procedure on the damages recoverable shall not apply. However, the damages recovered shall not exceed the damages permitted to be recovered pursuant to subdivision (b) of Section 3333.2 of the Civil Code. [It] (c) The standards set forth in subdivision (b) of Section 3294 of the Civil Code regarding the imposition of punitive damages on an employer based upon the acts of an employee shall be satisfied before any damages or attorney's fees permitted under this section may be imposed against an employer."
[8] And although it is true, as the Fourth District suggests in Community Care, that punitive damages are not covered by insurance (Community Care & Rehabilitation Center v. Superior Court, supra, 79 Cal.App.4th at p. 791, fn. 5, 94 Cal.Rptr.2d 343), the fact is that almost all such claims are accompanied by allegations of negligenceso that, at the pleading stage, an insured health care provider is not left without a claim for a defense. (Horace Mann Ins. Co. v. Barbara B. (1993) 4 Cal.4th 1076, 1081-1087, 17 Cal.Rptr.2d 210, 846 P.2d 792.)